UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
------------------------------------------------------x
NIKHIL DHIR,

                    Plaintiff,

    -against-

CARLYLE GROUP EMPLOYEE CO.,
CARLYLE GROUP,
VERMILLION ASSET MANAGEMENT,
CHRIS NYGAARD, CHRIS ZUECH,
and ANDREW GILBERT

                    Defendants.
------------------------------------------------------x

## VERIFIED COMPLAINT

(JURY TRIAL DEMANDED)

Plaintiff Nikhil Dhir, (hereafter, "plaintiff"), by his attorney, Kristan Peters-Hamlin, complaining of Carlyle Group Employee Co., Carlyle Group, Vermillion Asset Management, Chris Nygard, Chris Zuech, Andrew Gilbert (hereafter, "defendants"), alleges as follows:

### Nature of the Action

1.     This is an action under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B) and Title VIII of Sarbanes-Oxley Act of 2012 (18 U.S.C. 1514 A).

2.     This is a whistleblower retaliation case brought by Mr. Dhir against his former employers under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B)) and under §806 of the Sarbanes-Oxley Act.

1

3. This is a wrongful discharge claim under Connecticut General Statutes §§ 31-51m because defendants retaliated against plaintiff by illegally terminating him from his position, for which he was qualified because he engaged in the below-described protected activity and complained about illegal practices that were in violation of Connecticut and federal public policy.

4. This is a claim for breach of contract for defendants' failure to pay plaintiff's earned incentive compensation, as agreed.

5. This is a claim for unpaid wages, under Connecticut General Statutes §31-71a (3) (which defines compensation as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, *commission or other basis of calculation*") because defendants refused to pay plaintiff his earned incentive compensation.

6. Alternatively, this is a claim under Section 190 and 191 of Article 6 of the New York Labor Law. Section 190(2) of Article 6 of the New York Labor Law, and Section 191 (subd 1, par c) of the Labor Law requires employer to pay bonuses no later than date agreed between employer and employees and defines wages in CLS Labor § 190(1) where an employment terms contain a compensation package which includes bonuses based on set formula, taking into account personal productivity.

## The Parties, Venue and Jurisdiction

7. Plaintiff, Nikhil Dhir, was formerly employed by the corporate defendants the Carlyle Group, Carlyle Group Employee Co. (collectively, "Carlyle")

and Vermillion Asset Management, LLC ("Vermillion" or "VAM") in the position of Portfolio Manager—Oil Products. Vermillion was and is a subsidiary of Carlyle. Individually named defendants Chris Nygaard, Chris Zuech, and Andrew Gilbert (hereafter, "Individual Defendants") worked out of New York City offices of Vermillion and Carlyle, and they operated in a supervisory and superior position to Dhir. Vermillion also maintained a location during the relevant time period at 1 Soundshore Drive, Greenwich, Ct., 06830, which later became another office of Carlyle, once it acquired Vermillion.

8. The Carlyle corporate defendants are headquartered in Washington D.C. Carlyle is a publicly traded company. They have offices in New York City and during the relevant time period, in Greenwich, CT.

9. Nikhil Dhir is a resident at 271 Maple St., Litchfield, CT, 06759.

10. Upon information and belief, defendant Chris Nygaard lives at 125 5 Mile River Rd., Darien, CT, 06820. Upon information and belief, Carlyle terminated him in June 2015 for malfeasance.

11. Upon information and belief, defendant Drew Gilbert lives at 33 Club Rd., Riverside, Ct., 06878 and Carlyle terminated him in June 2015 for malfeasance.

12. Defendant Chris Zuech's address is unknown, but he may be served through the corporate defendants because he is still employed at Carlyle.

13. The jurisdiction of the Court is founded upon 28 U.S.C. §1331 (federal question). This Court has subject matter jurisdiction pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B) and Title

VIII of Sarbanes-Oxley Act of 2012 (18 U.S.C. 1514 A) and the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B)) and under §806 of the Sarbanes-Oxley Act.

14. Supplemental jurisdiction over the plaintiffs' state law claims is invoked pursuant to 28 U.S.C. §1367, as the state claims are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The state claims arise out of the same transactions and occurrences as the plaintiffs' federal claims. This Court has pendent jurisdiction over the state claims.

15. As the District of Connecticut is the district where a substantial part of the events or omissions giving rise to these claims occurred, and the plaintiff lives here and worked here while employed at the corporate defendants and two of the individual defendants live here, venue is proper within this District pursuant to 28 U.S.C. §1391(b)(2) and (3).

16. Plaintiff has properly exhausted administrative remedies on a timely basis. He filed a timely claim with the U.S. Department of Labor –O.S.H.A. on July 24, 2015. The matter was investigated. Because 180 days expired without any findings, plaintiff provided on January 26, 2016, notice of his intent to withdraw his claim and file in federal court.

## BACKGROUND FACTS

17. Vermillion was founded in 2005 by Andrew Gilbert and Chris Nygaard. Vermillion managed a fund called the Viridian Fund.

18. Vermillion hired plaintiff in September 2012 as an energy portfolio

4

manager. He and other portfolio managers were hired to be portfolio managers for, and were required to be investors in, the Viridian Fund.

19. During the relevant time period, VAM was supposed to focus on trading the spectrum of available commodities-based instruments – physical commodities, derivatives and options – across all major sectors including agriculture, metals, soft commodities, freight and energy.

20. VAM was acquired in 2012 by Carlyle and plaintiff became an employee of Carlyle.

21. Vermillion and Carlyle marketed the Viridian fund to investors as a diversified investment fund. The Viridian fund was marketed (starting in 2005 and continuing thru 2012] as a low volatility (fund would move less than 1%/day=target volatility), liquid (fund would be in investments with easy exits), diversified commodity fund, with superior risk controls (combo of the above factors) and a fundamental outlook (basing decisions on supply and demand of the commodity--information based decisions). Historically—and as marketed to investors – no more than 30% of the investment portfolio of the Viridian Fund would be allocated to a single commodity.

22. This promise and representation by defendants to their investors was material, because it ensured the investors that their investment risk would be diversified.

23. Freight[1] is much more volatile and high risk than any of the other

---

[1] When referring to freight herein, it means freight futures or FFA's, which are derivatives that are based on the price to lease a capesize vessel to carry dry bulk per day. This means that as the cost to lease a capesize vessel increases, the value of the derivative will

5

commodities traded in Viridian.

24. The Viridian Fund initially entered into a long freight position in 2012, and held this position until even after February 2015, which is when plaintiff was terminated. (In other words, the Fund bought contracts that would make money if freight rates went up in the future and they would lose money if freight rates went down).

25. Between 2012 and 2014, the percentage of the Fund that was allocated to freight rose to over 90%. This was therefore not a diversified investment fund as marketed and advertised, and it was in a very high risk investment.

26. In violation of how it was marketed to investors, this did not constitute a diversified investment fund, by any account.

27. Over the course of the year 2014, the concentration of the fund steadily increased into this freight position.

28. The partners of the fund consistently claimed both to the portfolio managers and to the investors that the position was liquid and could be exited with minimal market impact; however this was false. Every time any hedge fund with the same position was exiting a long freight position, there were significant losses suffered by that party.

---

increase. A forward freight agreement (FFA) is a financial forward contract that allows ship owners, charterers and speculators to hedge against the volatility of freight rates. It gives the contract owner the right to buy and sell the price of freight for future dates. FFAs are built on an index composed of a shipping route for tanker or a basket of routes for dry bulk, contracts are traded 'over the counter' on a principal-to-principal basis and can be cleared through a clearing house. To make an investment in freight, a hedge fund can simply purchase FFA's or freight futures. This is what the Viridian fund did to gain exposure to the freight market.

29.     The fund suffered large losses and a rapid increase in volatility. By the beginning of 2014, the freight position was already climbing dangerously high as a percentage of the Fund's investment risk. It amounted to between 30% and 50% of the Fund's total risk in early 2014.

30.     Upon information and belief, this sort of concentration risk was ***not*** discussed with investors when the Fund was initially marketed.

31.     Over the year, the concentration of the fund steadily increased into this freight position.

32.     By the autumn of 2014, the investment was heading towards losses and a bleak future, and it was clearly in the investors' best interests for the defendants to disinvest in freight, in order to save investors from more serious losses. The position was absolutely not liquid, despite the partners falsely informing the portfolio managers and the clients that it was.

33.     Defendants told the investors that the freight positions was the right position, and advised them to keep their money in the fund for a recovery. Defendants falsely informed the clients this because it would increase the amount of fees the partners would receive from investors, while they kept their money in the fund.

34.     It was clear to plaintiff and some of the other portfolio managers that the defendants were not motivated by a desire to protect the investors' capital because they maintained the freight position in the face of unacceptable losses and contradicting data.

35.     In fact, given the poor returns of the fund, the partners stated it would be better for them to ride the position to zero (meaning that there would be zero

investor assets remaining), rather than admit that this trade had been incorrect, exit the trade and thereby lose investors and, as a consequence, the fees that investors paid to the Fund's partners.

36. In October 2014, it became very apparent that, any of the reasons given to investors to justify investing in freight were incorrect, and in fact every data point indicated that the investment was risky and dangerous.

37. By October 2014, things got to a boiling point and portfolio managers sat in a room at Carlyle to discuss the issue with Drew Gilbert. Several of them (including plaintiff), called the situation an "Enron" situation. Chris Nygaard told the portfolio managers that it would be better for the Vermillion Fund co-owners, to let freight go to zero, even though it would hurt the Fund's customers.

38. In the autumn of 2014, both in the above-referenced open meeting format as well as in writing, plaintiff and the other portfolio managers raised concerns to Drew Gilbert, Chris Nygaard and Chris Zuech of VAM's poor risk management and a deviation from strategy. The open format of the meeting resulted in the partners being hostile towards the complaining portfolio managers (including plaintiff) who claimed there was no risk management, and that the fund was acting "crazy" and irresponsible.

39. Nonetheless, reflecting a series of decisions that were in clear conflict of interest with the interests of the investors and in violation of the defendants' fiduciary duties to those investors, Drew Gilbert indicated to portfolio managers that if the Fund withdrew from its freight position (as was clearly the responsible thing to do and in keeping with the defendants' fiduciary obligations), the investors would

withdraw their money from Viridian and the Viridian Fund would therefore lose its fees paid by those investors.

40. Gilbert took the position that, in order to keep the investors in the Fund, he had to mislead them about the freight story even though the available data entirely contradicted what he and Carlyle were telling investors.

41. Gilbert also warned the portfolio managers who were complaining about the risk and defendants' misrepresentations that they would lose their jobs if they insisted that the investors be advised of the problems, so that the investors could withdraw in time to avoid losses.

42. Plaintiff and other Carlyle employees subsequently heard defendants mislead the investors over the phone about the nature of the risk and the continued viability of the investment. Defendants also sent misleading correspondence to investors.

43. In plaintiff's performance evaluation for the third quarter of 2014, plaintiff made comments that that the Fund's risk was too great and that freight was dangerously decreasing in value.

44. In fact, each of the portfolio managers who complained about defendants' deception of the Fund's investors, and the lack of internal controls, ultimately were terminated as a consequence of complaining.

45. The partners continued to mislead that the position was in fact liquid, that the freight position was the right position, and advised the investors to keep their money in the fund for a recovery. This misinformation was calculated to increase the amount of fees the partners would receive from investors while the investors kept

their money in the fund. It was clear that defendants' decision to mislead the investors was not driven by their fiduciary obligation to protect the investors capital. The defendants made their conflict of interest abundantly clear when they told plaintiff and the portfolio managers, in the face of poor returns of the fund, that it would be better for the defendants to lose all the investors' assets in this investment, rather than make a trading decision to exit, thereby losing the fees paid by the investors to defendants

46. There was a conflict of interest between the partners and the investors, which included public pension funds.

47. Even after the losses were clearly unacceptable, the partners knowingly mislead the investors that they believed that the freight investment position would come back and therefore they were not reducing the risk on it.

48. Making abundantly clear that defendants' advice to the investors was knowingly and intentionally fraudulent, the defendants were simultaneously informing the portfolio managers internally (within Carlyle), that the reason defendants could not reduce the investment in freight, even though they acknowledged the investment and the risk was too great, was because if they informed investors they did not have confidence in the viability of the trade, the investors would withdraw their investments and the financial result to VAM would mean that all of those (including plaintiff) working on the Viridian Fund would all lose their jobs.

49. Plaintiff continued to exhibit to defendants and other portfolio managers how upset he was with what he considered to be an Enron-like situation.

He complained and voiced his concern about the unethical behavior of defendants and their defrauding of the investors to his supervisor, the lack of internal controls, and conduct which included, inter alia, the use of electronic means to defraud investors, which amounted to wire fraud.

50. Gilbert, Zuech and Nygaard became concerned about plaintiff's complaints to his supervisor, Drew Gilbert, which amounted to whistleblowing activities.

51. Fortunately, the portfolio that plaintiff was responsible for managing focused on energy investments and was not invested in any freight trading. Therefore, during 2014, plaintiff continued to generate handsome profits for his portfolio's investors in Viridian.

52. Only approximately three portfolio managers were making a profit for defendants during 2014. Indeed, among VAM portfolio managers, plaintiff returned the greatest profit for defendants in 2014 in both an absolute terms, and as a percentage of the investment capital allocated to invest to each portfolio manager.

53. In 2014, plaintiff produced profits of $11.5 million. Throughout 2014, in order to induce plaintiff to stay at Carlyle, Drew Gilbert told plaintiff that his bonus would be based on anything that he produced over two million dollars. Plaintiff was told that his incentive compensation would be based on his individual performance at a competitive double-digit rate, which normally ranges in the industry between ten and seventeen percent. Thus, his promised compensation would be approximately $1,282,500 (ie: 13.5% multiplied by $9.5 million). Plaintiff's incentive compensation was like a commission in that it was a negotiated and material part of his

11

compensation pay and was not discretionary.

54. In January 2015, plaintiff continued to generate a profit of approximately $1 million. Typically, Carlyle informed its employees of their bonuses in January and then paid all their employees at the end of January. Then, the day before defendants were obliged to pay plaintiff his incentive pay at the end of January, defendants suddenly terminated plaintiff because of his whistleblowing activities.

55. Tellingly, the other portfolio managers who complained also were terminated. In contrast, certain portfolio managers who had poor performance and lost money for defendants, but who did not complain about their unethical conduct and defrauding of investors, were retained.

### FIRST CLAIM FOR RELIEF
### RETALIATION
In violation of
SARBANE-OXLEY,
18 USC §1514A

56. Plaintiff repeats the allegations in paragraph 1 through 55, as though fully set forth herein.

57. Plaintiff had a reasonable belief that the Respondents engaged in the above conduct violative of Sarbanes Oxley, including lack of internal controls, lack of proper disclosures and wire fraud, in violation of 18 U.S.C. § 1343.

58. He complained about those violations to his supervisor, Drew Gilbert.

59. As a direct result of plaintiff's whistleblowing activities, defendants retaliated against plaintiff and terminated plaintiff's employment, and refused to

pay him his earned incentive compensation.

60. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' acts.

61. Plaintiff is entitled to such damages as to be established at trial.

**SECOND CLAIM FOR RELIEF**
**RETALIATION**
In violation of
DODD FRANK,
15 USC §78U-6(H)(1)(B)

62. Plaintiff repeats the allegations in paragraph 1 through 55, as though fully set forth herein.

63. Plaintiff had a reasonable belief that the Respondents engaged in conduct violative of DODD-FRANK, including lack of internal controls, lack of proper disclosures and wire fraud, in violation of 18 U.S.C. § 1343.

64. He complained about those violations to his supervisor, Drew Gilbert.

65. As a direct result of plaintiff's whistleblowing activities, Defendants retaliated against plaintiff Defendants and terminated plaintiff's employment, and refused to pay him his earned incentive compensation.

66. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' acts.

67. Plaintiff is entitled to such damages as to be established at trial.

**THIRD CLAIM**
**FOR RELIEF**
**WRONGFUL**
**DISCHARGE**
In violation of C.G.S.
§§ 31-51m

68. Plaintiff repeats the allegations in paragraph 1 through 55, as though fully set forth herein.

69. By acts and practices described above, defendant retaliated against plaintiffs by illegally terminating him from a position in which he was qualified because he engaged in the above-described protected activity and complained about illegal practices that were in violation of both Connecticut and federal public policy and which included, but were not limited to, complaining about fraud, lack of internal controls, failure to disclose material information to investors.

70. Defendant's acts and omissions were intentional, malicious and wanton.

71. Defendant is liable as plaintiff's employer pursuant to Connecticut General Statutes §§ 31-51m.

72. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendant's illegal conduct.

73. Plaintiff is entitled to an award of compensatory and punitive damages, to be determined at trial.

### FOURTH CLAIM FOR RELIEF
BREACH OF CONTRACT

74. Plaintiff repeats the allegations in paragraph 1 through 55, as though fully set forth herein.

75. Defendants had an agreement with plaintiff that he would receive

commissions-like incentive pay, as a percentage of his profits produced.

76. Defendants induced plaintiff to stay during 2014 by telling him that, if he stayed, they would pay him a bonus that was a double-digit percentage of his profits produced.

77. In reliance on defendant's statements and their agreement to pay him a bonus, plaintiff remained in defendants' employment through January 2015.

78. Even though plaintiff fulfilled his end of the bargain and produced $11.5 million in profits for the defendants in 2014, they refused to pay him his incentive pay as agreed.

79. Plaintiff is now suffering and will continue to suffer monetary damages as much as $1,615,000.

80. Plaintiff is entitled to an award of compensatory to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### FRAUD

81. Plaintiff repeats the allegations in paragraph 1 through 55, as though fully set forth herein.

82. Defendants had an agreement with plaintiff that he would receive commissions-like incentive pay, as a percentage of his profits produced.

83. Defendants fraudulently induced plaintiff to stay during 2014 by telling him that, if he stayed, they would pay him a bonus that was a double-digit percentage of his profits produced.

84. In reliance on defendant's statements and their agreement to pay him a bonus, plaintiff remained in defendants' employment through January

15

2015.

85. Even though plaintiff fulfilled his end of the bargain and produced $11.5 million in profits for the defendants in 2014, they refused to pay him his incentive pay as agreed, knowing that they had no intention to do so.

86. Plaintiff is now suffering and will continue to suffer monetary damages as much as $1,615,000.

87. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendant's illegal conduct.

88. Plaintiff is entitled to an award of compensatory and punitive damages, to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays as follows:
1. For such nominal, compensatory, statutory, exemplary and punitive damages as shall be found at trial, together with appropriate equitable relief;
2. For attorney's fees, costs associated with this action, expert fees and prejudgment and post-judgment interest;
3. For back pay, front pay, lost job benefits;
4. For restoration of employee benefits and reimbursement of employee benefits;
5. Enjoining and permanently restraining these violations; and
6. For such other relief as the Court deems just and proper.

## JURY DEMANDED BY PLAINTIFF

Plaintiffs hereby demand, pursuant to Rule 38(b) of the Federal Rule of Civil Procedure, a trial by jury in this action.

Respectfully submitted,

PLAINTIFF

BY: *Kristan Peters-Hamlin*
    Kristan Peters-Hamlin
    Peters Hamlin LLC
    37 North Ave., Suite 201
    Norwalk, CT, 06851

I, NIKHIL DHIR, have read the above complaint and verify that it is true and accurate to the best of my knowledge and belief.

_____    _2/9/16_____
Nikhil Dhir                               date