# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 16-cv-06378 (RJS)

NIKHIL DHIR

Plaintiff,

VERSUS

CARLYLE GROUP EMPLOYEE CO., *ET AL.*,

Defendants.



OPINION AND ORDER
September 29, 2017

RICHARD J. SULLIVAN, District Judge:

Plaintiff Nikhil Dhir brings this suit against corporate Defendants Carlyle Group Employee Co., Carlyle Group (collectively, "Carlyle"), and Vermillion Asset Management, LLC ("Vermillion"); and individual Defendants Chris Nygaard, Christopher J. Zuech, and Andrew Gilbert, asserting a variety of federal and state-law claims arising from his employment by Defendants. (Doc. No. 63 ("SAVC" or "Second Amended Verified Complaint").) Now before the Court is Defendants' partial motion to dismiss the Second Amended Verified Complaint for failure to state a claim. (Doc. No. 65.) For the reasons set forth, Defendants' motion is granted in part and denied in part.

I. BACKGROUND

A. Facts

In 2005, Defendants Nygaard and Gilbert founded Vermillion, a commodities hedge fund.[1] Seven years later, in 2012,

---

[1] The following facts are taken from the Second Amended Verified Complaint. (Doc. No. 63.) The Court also considers the arguments raised in Defendants' memorandum of law (Doc. No. 66 ("Def. Br.")), Plaintiff's opposition (Doc. No. 70 ("Opp'n")), Defendants' reply (Doc. No. 74 ("Reply")), and the accompanying declarations and exhibits, including Plaintiff's employment agreement (Doc. No. 67-2), which consists of a July 2012 offer letter, an August 2012 addendum containing a choice-of-law clause, and an October 2012 offer letter incorporating those two documents by reference. Because Plaintiff's complaint specifically references the employment agreement (SAVC ¶¶ 20,

they hired Plaintiff as an energy portfolio manager for their Viridian Fund. (SAVC ¶¶ 8, 18–19; Doc. No. 67-2.) In July 2012, Plaintiff signed an offer letter from Vermillion that stated that his compensation would "consist of a base salary and eligibility for a discretionary annual bonus." (Doc. No. 67-2 at 8; *see also* SAVC ¶ 20.) The offer letter specified that the amount of the bonus, "if any," would "depend upon [Vermillion's] assessment of [Plaintiff's] performance, the performance of [Vermillion] and the funds as whole," and stated that the letter would "supersed[e] any prior oral or written agreements or understandings" and could not be changed except in a signed writing. (Doc. No. 67-2 at 8-9.)

Later that year, Carlyle acquired Vermillion and Plaintiff became an employee of Carlyle. (SAVC ¶ 21.) Plaintiff alleges that during the acquisition, Defendants induced him to come to Carlyle by orally promising him "that he would be guaranteed . . . an annual bonus of 10%" of the revenue he produced in any given year. (*Id.* ¶ 20.) This promise was not made in writing, Plaintiff explains, because a 10% minimum bonus based on performance was the industry standard. (*Id.*) Nevertheless, in October 2012, Plaintiff signed an offer letter from Carlyle that incorporated by reference the earlier letter, with its discretionary-bonus

---

54), and the majority of Plaintiff's claims relate to his "employment terms" and "compensation package" that are expressly governed by that agreement, the Court deems the employment agreement to be integral to the complaint and properly considered for the purposes of this motion. *See Chen v. Antel Cmmc'ns,* LLC, 653 F. App'x 43, 43–44 (2d Cir. 2016) (summary order); *Hamzaraj v. ABM Janitorial Ne. Inc.*, No. 15-cv-2030 (ER), 2016 WL 3571387, at *1 n.2 (S.D.N.Y. June 24, 2016) (considering collective bargaining agreement because complaint was "based entirely on his employment relationship with [defendant], of which the CBA is an integral part").

provision, and included similar integration and no-oral modification clauses. (*Id.* at 2–3.)

Following Carlyle's acquisition of Vermillion, Carlyle and Vermillion marketed the Viridian Fund to investors as a liquid, low-volatility, diversified commodity fund wherein no more than 30 percent of the portfolio would be allocated to a single commodity. (*Id.* ¶ 23.) However, Plaintiff alleges that between 2012 and 2014, the percentage of the Viridian Fund allocated to certain shipping derivatives known as forward freight agreements rose to over 90 percent, causing substantial deviation from the as-marketed diversification standards. (*Id.* ¶¶ 25, 27.)

Throughout 2014, the fund managers allegedly continued to misrepresent to investors the fund's liquidity and risk profile, encouraging them to remain in the fund despite the fact that their investment was "heading towards losses and a bleak future." (*Id.* ¶¶ 31–34.) Although by October 2014 all data indicated that the investment was risky and dangerous, Nygaard stated at a meeting of the fund managers gathered at Carlyle that month that it would be "better for the Vermillion Fund co-owners to let [the] freight go to zero, even though it would hurt the customers." (*Id.* ¶¶ 34-38.) It became clear to Plaintiff that Defendants intended to maintain their freight investment, despite unacceptable losses and in violation of their fiduciary duties, in order to continue receiving fees from investors. (*Id.* ¶¶ 34, 40, 46.)

Plaintiff was uncomfortable with the fund's investment position. At an October 2014 meeting, in writings, and at his 2014 third-quarter performance evaluation, Plaintiff raised concerns to Gilbert, Nygaard, and Zuech that the fund was deviating from strategy, acting irresponsibly, and defrauding investors. (*Id.* ¶¶ 39, 50.)

According to Plaintiff, at the October meeting, the fund partners were hostile to him for speaking against the freight investment, and Gilbert warned Plaintiff and other fund managers in attendance that they would lose their jobs if they insisted that investors be told of the fund's troubles. (*Id.* ¶¶ 39, 42.) Toward the end of January 2015, Plaintiff was fired allegedly in retaliation for his "whistleblower activities." (*Id.* ¶ 61.) Plaintiff asserts that each of the other fund managers who complained about Defendant's defrauding investors or lack of internal controls were also terminated, while certain managers with poor performance, but who did not complain, were retained. (*Id.* ¶¶ 45, 62.) One poorly performing manager, Plaintiff avers, even received a bonus of over a million dollars despite his direct contribution to the fund's 2014 losses. (*Id.* ¶ 62.) Plaintiff, in contrast, returned the greatest profit of the managers in 2014 – both in absolute terms and as a percentage of his allocated capital in the fund – but was still terminated by Defendants at the end of January 2015. (*Id.* ¶ 53.)

Plaintiff also alleges that Defendants cheated him out of a bonus – specifically, a payout of about $1.3 million that Defendants had promised him for his performance in 2014. (*Id.* ¶ 54.) According to Plaintiff, around March 2014, Gilbert orally promised him that he would receive a non-discretionary bonus based on any revenue he generated over two million dollars, and that Plaintiff's cut would be upped from the usual 10 percent to a "more competitive double-digit rate, . . . which normally ranges in the industry between ten and seventeen percent." (*Id.*) Gilbert allegedly repeated that oral promise around October 2014, during Plaintiff's performance evaluation at Carlyle's New York office. (*Id.* ¶ 56–57.) According to Plaintiff, Gilbert actually had no intention of paying Plaintiff his promised bonus and made the promise only to induce Plaintiff – one of the few successful managers – to stay at a fund that was souring. Indeed, Plaintiff asserts that there would be no reason for him to have stayed with the fund in 2014 given his knowledge of the fund's performance had he not been promised a bonus that would be independent of general fund performance. (*Id.* ¶ 57–58.) Plaintiff contends that Gilbert's representations induced him to stay and to turn down an offer with a different employer in which he would have made over one million dollars. (*Id.* ¶ 59.) Despite Plaintiff's reliance on this promise and his production of $11.5 million in revenue in 2014, he was not paid a bonus for that year. (*Id.* ¶ 61.)

B. Procedural History

On February 9, 2016, Plaintiff filed the first complaint in this action (Doc. No. 1), which he then amended on July 7, 2016 (Doc. No. 32). Plaintiff filed a second amended complaint on November 11, 2016, and a corrected version (the "Second Amended Verified Complaint") on November 14, 2016, in which he asserts nine causes of action: (1) retaliation in violation of the Sarbanes-Oxley Act (against all Defendants except Zuech); (2) retaliation in violation of the Dodd-Frank Act (against all Defendants except Zuech); (3) wrongful discharge in violation of Connecticut General Statutes § 31-51(m); (4) breach of contract; (5) fraud; (6) unpaid wages in violation of Connecticut General Statutes §31-71a(3); (7) unpaid wages in violation of New York Labor Law § 190 *et seq.*; (8) quantum meruit ("unjust enrichment"); and (9) promissory estoppel.

On the evening of December 1, 2016, the day before Defendants were scheduled to file their motion to dismiss the second amended complaint, Plaintiff submitted a letter to the Court requesting leave to file a third amended complaint that would add two

3

new causes of action. (Doc. No. 64.) On December 2, 2016, Defendants filed their motion to dismiss the second amended complaint, as scheduled. (Doc. Nos. 65-67.) At the same time, Defendants submitted a letter opposing Plaintiff's request to file a third amended complaint. (Doc. No. 68.) The Court denied Plaintiff's request to file a third amended complaint, without prejudice to renewal following the resolution of Defendants' motion to dismiss, which was fully briefed on February 3, 2017. As set forth therein, Defendants seek dismissal of Plaintiff's Sarbanes-Oxley claim as to "The Carlyle Group" and the remaining claims as to all Defendants, except that Defendants do not seek to dismiss Plaintiff's Dodd-Frank whistleblower claim.

## II. CHOICE OF LAW

Before addressing the substance of Plaintiff's claims, the Court must first determine whether New York or Connecticut law applies. As this case is before the Court on diversity jurisdiction, the Court "must look to the choice of law rules in the forum state," which is New York. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

With respect to Plaintiff's fourth cause of action, for breach of contract, Plaintiff's employment agreement contains an express choice of law clause that provides:

> This Agreement and the rights and obligations of the parties hereunder shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of New York, without regard to its rules of conflicts of law.

(Doc. No. 67-2 at 12.) New York courts "will generally 'enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.'" *Ergowerx Int'l, LLC v. Maxell Corp. of Am.*, 18 F. Supp. 3d 430, 439 n.5 (S.D.N.Y. 2014) (quoting *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006)). Given that Plaintiff's second offer letter was sent to him at a New York apartment address (*see* Doc. No. 67-2 at 2), several of the Defendants reside in or have their principal place of business in New York, and the parties agree that New York law applies to the breach-of-contract claim, the Court finds that New York law governs Plaintiff's breach-of-contract claim.

The parties nevertheless dispute whether Connecticut or New York law should govern Plaintiff's fifth, eighth, and ninth causes of action for fraud, unjust enrichment, and promissory estoppel. (*Compare* Def. Br. 8-10 *with* Opp'n 5-13.) The Court finds, and the parties do not seem to dispute, that the choice-of-law clause in the employment agreement does not cover these claims because it is not "sufficiently broad as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (internal punctuation marks omitted); *see also Commerce & Indus. Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 07-cv-5731 (JGK), 2008 WL 4178474, at *4 (S.D.N.Y. Sept. 3, 2008) (citing *Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 333–34 (2d Cir. 2005) ("New York courts are generally reluctant to construe choice of law provisions broadly. Under this approach, 'extra-contractual' claims, such as tort claims that arise only incidentally to the contract are not covered by the choice of law clause.").[2] Accordingly,

---

[2] *See Krock*, 97 F.3d 640, 645 (fraud); *Gross Found., Inc. v. Goldner*, No. 12-cv01496 (ILG), 2012 WL 6021441, at *11 (E.D.N.Y. Dec. 4, 2012) (unjust enrichment); *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307, 320 (S.D.N.Y. 2010) (promissory estoppel).

4

for those causes of action, the Court must engage in a separate choice-of-law analysis for each claim.

Under New York law, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley*, 153 F.3d at 12. A conflict exists "[w]here the applicable law from each jurisdiction provides different substantive rules." *Id*. With respect to Plaintiff's claims for quantum meruit and promissory estoppel, there is no conflict between the substantive laws of Connecticut and New York. *See Czech Beer Importers, Inc. v. C. Haven Imports*, LLC, No. 04-cv-2270 (RCC), 2005 WL 1490097, at *6 (S.D.N.Y. June 23, 2005) (finding the laws of New York and Connecticut are in agreement regarding unjust enrichment); *compare Colby v. Pye & Hogan LLC*, 602 F. Supp. 2d 365, 373 (D. Conn. 2009) (elements of promissory estoppel), *with Karmilowicz v. Hartford Fin. Servs. Grp*., No. 11-cv-539 (CM) (DCF), 2011 WL 2936013, at *12 (S.D.N.Y. July 14, 2011), *aff'd sub nom. Karmilowicz v. Hartford Fin. Servs. Grp., Inc*., 494 F. App'x 153 (2d Cir. 2012) (same). Moreover, no choice of law analysis need be undertaken for these claims because Plaintiff, as the "party urging a choice of law analysis," has not provided any case law comparing the substantive state law for these claims, and has "fail[ed] to demonstrate a true conflict between New York and another state's laws." *Bass v. World Wrestling Fed'n Entm't, Inc*., 129 F. Supp. 2d 491, 504 (E.D.N.Y. 2001) (citing *Portonova v. Trump Taj Mahal Assocs.*, 270 A.D.2d 757, 759-60 (3rd Dep't), *lv. denied*, 95 N.Y.2d 765 (2000)). "Where there is no actual conflict of laws, New York dispenses with the choice-of-law analysis." *Intellivision v. Microsoft Corp*., No. 07-cv-4079 (JGK), 2008 WL 3884382, at *4 (S.D.N.Y. Aug. 20, 2008).

With regard to Plaintiff's fraud claim, Plaintiff again fails to cite any case law to support an actual conflict between New York and Connecticut law. Nevertheless, the Court finds that, although the elements of fraud are very similar in both states, there is a material difference between them. Specifically, the Court notes that while both New York and Connecticut require a showing that the plaintiff relied on defendant's misrepresentation, only New York law requires that reliance also be reasonable. *Intellivision*, 2008 WL 3884382, at *4 (comparing elements of fraud and citing state law cases). Because of this conflict, the Court must proceed to the second step in New York's choice of law analysis, which looks to the law of the state with the greatest interest in the litigation. *Curley*, 153 F.3d at 12.

"Under the interest analysis test, torts are divided into two types, those involving the appropriate standards of conduct . . . and those that relate to allocating losses that result from admittedly tortious conduct." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co*., 449 F.3d 377, 384 (2d Cir. 2006) (internal quotation marks omitted). For conduct-regulating rules, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.* In a fraud claim, "the locus of the tort is generally deemed to be the place where the injury was inflicted, rather than where the fraudulent act originated." *In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013); *accord Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973) ("[A] cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence.") (Friendly, J.). Accordingly, "[u]nder New York conflict of law principles, fraud claims are governed by the

5

state in which the injury is deemed to have occurred, which is usually where the plaintiff is located." *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 F. App'x 287, 288 (2d Cir. 2004) (summary order); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 292 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001).

Here, although Plaintiff alleges that Defendant's misrepresentations were made in New York, he also alleges that Connecticut is where "a substantial part of the tortious conduct, events or omissions giving rise to these claims occurred." (SAVC ¶¶ 16, 57.) More importantly, Plaintiff alleges that he worked in Connecticut while employed by Defendants and was, during "all relevant times" a resident of Connecticut (although he may have had a second residence in New York). (*Id*. ¶¶ 10, 16). Because Plaintiff was living in Connecticut, that is where he sustained his alleged loss from Defendants' alleged fraud. Thus, the Court finds that the laws of Connecticut govern Plaintiff's fraud claim.

III. SUFFICIENCY OF THE PLEADINGS

Having resolved the choice of law issues, the Court now addresses the sufficiency of Plaintiff's pleadings. To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id*. at 570.

The Court will address each of Plaintiff's claims in turn, starting with his bonus-related common-law and statutory claims and finishing with his whistleblower-retaliation claims under state and federal law.

A. Breach of Contract

To recover for breach of contract under New York law, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by the defendant's breach. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). Here, Plaintiff does not seek to recover for breach of his written employment agreement with Defendants. Instead, Plaintiff seeks to recover for the breach of two alleged oral promises: one made to him by unspecified Defendants in 2012 before he signed his Carlyle offer letter, and a second one made to him by Gilbert two years later. (SAVC ¶¶ 20, 54.)

6

Taking all of Plaintiff's factual allegations as true, New York law precludes Plaintiff's recovery for either oral promise.

With respect to the first oral promise, Plaintiff alleges that in 2012 Defendants promised him a non-discretionary annual bonus of at least 10 percent of the annual revenue he generated, which reflected the industry standard. (*Id.* ¶ 20.) Defendants allegedly made this promise in an attempt to recruit Plaintiff to Carlyle, prior to Plaintiff's signing his Carlyle offer letter. (*Id.*) The second oral promise was allegedly made about two years later, in October 2014, when Andrew Gilbert promised Plaintiff that he would receive a non-discretionary performance-based bonus that would be upped from the industry standard of 10 percent to a higher "double digit" rate on "anything [Plaintiff] produced over two million dollars." (*Id.* ¶ 54.)

However, the agreement with Vermillion that Plaintiff signed and accepted in 2012 (his first offer letter) expressly and unambiguously states that his bonus, "if any," was to be "discretionary." (Doc. No. 67-2 at 8.) The agreement also contains an unambiguous integration clause, which states that the agreement "supersedes prior oral or written agreements," and an unambiguous no-oral modification clause, which provides that it "cannot be changed except in a writing signed" by company representatives. (*Id.* at 8–9.) Moreover, when Carlyle acquired Vermillion, Plaintiff signed another agreement, dated October 1, 2012, that incorporated the prior agreement by reference, attached it as an exhibit, and indicated that it would remain in full force and effect. (Doc. No. 67-2 at 2.)

Courts have repeatedly held that "a written policy clearly stating that bonus compensation is discretionary bars breach of contract claims based on oral bonus promises." *Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (collecting cases); *see also Kaplan v. Capital Co. of Am.*, 298 A.D.2d 110, 111, 747 N.Y.S.2d 504, 505–06 (1st Dep't 2002) ("Given the clearly expressed policy of the company that bonuses were to be paid solely at the company's discretion, [and the no-oral modification clause], plaintiff has no sustainable claim that defendant company entered into an enforceable agreement entitling him to bonus compensation."). Notwithstanding this settled precedent, Plaintiff attempts to distinguish his claim by emphasizing that his promised bonus was "non-discretionary" and based on a set calculation. (Opp'n at 13.) But that argument misses the point; whether the allegedly promised bonus was to be discretionary or non-discretionary is irrelevant. The relevant, and here dispositive, fact is that a written agreement superseded any earlier oral promises, disallowed any later oral modifications, and clearly indicated that Plaintiff's bonus, if any, would be at the discretion of his employer. *See Buckman,* 817 F. Supp. 2d at 339; *Baraliu v. Vinya Capital, L.P.*, 765 F. Supp. 2d 289, 298 (S.D.N.Y. 2011) (rejecting oral bonus promise as inconsistent with written contract containing no-oral modification clause).

For these reasons, Plaintiff's breach-of-contract claim must be dismissed.

### B. Fraud

As discussed above, Plaintiff's fraud claim is governed by Connecticut law. To establish a prima facie case of fraud under Connecticut law, a plaintiff must allege "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." *Weinstein v. Weinstein*, 882

A.2d 52, 62–63 (Conn. 2005). Although federal court pleadings generally need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," fraud plaintiffs are subject to the particularized pleading requirements of Federal Rule of Civil Procedure ("Rule 9(b)"). Thus, under Rule 9(b), fraud plaintiffs must "(1) detail the statements that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements . . . were fraudulent." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014). As to intent, knowledge, or other conditions of mind, the Second Circuit "require[s] plaintiffs to allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). The requisite "strong inference" may be inferred from particularized facts (1) showing motive and opportunity to commit fraud or (2) constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*; *see also Montanez v. D & D Auto, LLC*, No. 3:15-CV-397 (VAB), 2016 WL 1254199, at *9 (D. Conn. Mar. 29, 2016) (applying same standard to Connecticut common-law fraud claim).

Defendants first argue that Plaintiff's reliance on the alleged oral promise was unreasonable. As discussed above, however, the elements of Connecticut common-law fraud do not include a requirement that the plaintiff's reliance have been reasonable. *See Weinstein*, 882 A.2d at 62–64; *Goldstein v. Unilever*, No. 397881, 2004 WL 1098789, at *10 (Conn. Super. Ct. May 3, 2004) (collecting cases). And Defendants do not dispute that Plaintiff adequately alleged that he *in fact* relied on the promise, whether reasonably or unreasonably. Specifically, Plaintiff alleged that given Vermillion's poor performance, "there would have been no reason for him to stay during 2014 if he had not been promised" a non-discretionary bonus based solely on his individual performance, and that in reliance on that promise, he "declined to accept another job offer that he received in the last quarter of 2014." (SAVC ¶ 58.) Thus, Plaintiff has satisfied the reliance element under Connecticut law.

As to the scienter element, however, Plaintiff's allegations are mostly conclusory and insufficient to meet Rule 9(b)'s heightened pleading standard. For instance, Plaintiff alleges that Defendants "fraudulently induced" him to stay at Carlyle in 2014 by promising him a large bonus, that this misrepresentation was "made for the intention and purpose of defrauding" him, and that they "refused to pay him his incentive pay as agreed, knowing that they had no intention to do so." (*Id.* ¶¶ 90–92.) But such bare assertions that Defendants "knew the representations to be false" are mere "boilerplate characterization[s]" that fall far short of the particularized facts required by Rule 9(b). *Datto Inc. v. Braband*, 856 F. Supp. 2d 354, 380 (D. Conn. 2012) (citation omitted).

As for the remaining allegations, they yield at best a weak inference of fraudulent intent that is fraught with inconsistencies. Specifically, Plaintiff alleges that Defendants' fund was performing poorly in 2014, that Defendants needed to "incentivize the top performers" to stay, that Plaintiff was the most profitable portfolio manager at Vermillion in 2014, and that "no financial change had occurred . . . that could justify reneging on the promise[.]" (SAVC ¶¶ 53, 54, 56, 58.) According to Plaintiff's theory, he was such a stellar performer, and Gilbert was so desperate to retain him as the fund soured in 2014, that Gilbert had a strong motive to falsely promise Plaintiff an enhanced bonus that year.

8

That theory, however, contradicts not only common sense, but also other allegations in Plaintiff's own complaint. As an initial matter, although Plaintiff points to some reasons why Gilbert may have wanted to keep him at the firm, nowhere does Plaintiff explain what incentive Gilbert would have had to concoct a ploy that would so quickly unravel – either within seconds, if Plaintiff (a sophisticated financial professional) asked for the promise in writing, as required by his written employment agreement, which contained a no-oral modification clause, or within months, when Gilbert would, as planned, inevitably renege on the promise and Plaintiff would be left high and dry. Even if Plaintiff were, as he alleges, so invaluable to the firm, he does not explain why the firm would go to such lengths just to lose him within a period of months, after the annual bonus came due. Moreover, Plaintiff alleges that Gilbert repeated the promise around October 2014 – at the very time that Gilbert and Plaintiff's other supervisors were allegedly threatening to fire him for voicing concerns about the fund's lack of diversification. (SAVC ¶¶ 38, 39, 42, 56.) Thus, per Plaintiff's own whistleblower allegations, Gilbert had a motive to get rid of Plaintiff as soon as possible, not to keep him around another few months and then risk having him turn on the firm even more after being cheated out of his bonus.

In sum, Plaintiff's scienter theory is largely incoherent, with heavy doses of "speculation and conclusory allegations" that are implausible on their face. *Shields*, 25 F.3d at 1128 (citation omitted). As such, he has alleged not strong evidence of motive, but rather circumstantial, internally contradictory evidence of a harebrained, short-sighted conspiracy that defies logic. Therefore, because his allegations do not give rise to a "strong inference" of fraudulent intent, he has failed to establish the scienter element of his fraud claim. *Montanez*, 2016 WL 1254199, at *9.

Furthermore, as to the other individual Defendants, apart from the conclusory allegations discussed above, Plaintiff merely avers "upon information and belief" that "[they] knew about these promises by Gilbert." (SAVC ¶ 56.)) To begin with, the mere fact that Defendants "knew about these promises" does not mean they knew they were false, as required to state a claim for fraud under Connecticut law. *See Weinstein*, 882 A.2d at 62. And under Rule 9(b), "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *IKB Int'l S.A.*, 584 F. App'x at 28–29. Here, the only allegations of scienter as to Zuech and Nygaard are either conclusory, predicated on "guilt by association," or both.

The Court therefore dismisses Plaintiff's fraud claim with respect to all Defendants.

### C. Quantum Meruit

Under New York law, "a quantum meruit claim is a claim in quasi-contract." *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 394 (2d Cir. 2001). To state a claim in quantum meruit under New York law, a plaintiff must prove (1) that "the defendant was enriched"; (2) that "such enrichment was at the plaintiff's expense," and (3) that "circumstances were such that equity and good conscience require that the defendant should compensate the plaintiff." *Id.* at 403. It is well settled, however, that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388 (1987). In order to

9

determine as a matter of law that the existing contract may bar the quantum meruit claim, the Court must find that the language of Plaintiff's employment contract unambiguously covers the same subject matter. *Gould v. Lightstone Value Plus Real Estate Inv. Trust, Inc.,* 301 F. App'x 97, 99 (2d Cir. 2008) (summary order).

Here, Plaintiff seeks to recover incentive compensation, which is clearly addressed in Plaintiff's employment agreement. (*See* Doc No. 67-2 at 8.) That written agreement bars Plaintiff's quantum meruit claim. *See e.g.*, *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414 (S.D.N.Y. 2011) (written instrument governs bonus compensation to which plaintiffs allege they are entitled); *Aledia v. HSH Nordbank AG,* No. 08–CV–4342, 2009 WL 855951, at *3 (S.D.N.Y. Mar. 25, 2009) (dismissing plaintiff's bonus claim where written agreement covered incentive compensation). Moreover, Plaintiff cannot as a matter of law establish the second and third elements of his quantum meruit claim. Plaintiff does not dispute that he was paid his base salary for the period in which he seeks his non-discretionary bonus. Because the "law is clear that a plaintiff may not allege that his former employer was 'unjustly' enriched at his expense when the employer compensated the plaintiff by paying him a salary," Plaintiff's claim must fail. *Levion v. Societe Generale*, 822 F. Supp. 2d 390, 405 (S.D.N.Y. 2011), *aff'd*, 503 F. App'x 62 (2d Cir. 2012); *accord Karmilowicz*, 2011 WL 2936013, at *12) (dismissing quantum meruit claim where employer paid plaintiff salary and bonus was discretionary). Accordingly, the Court dismisses his quantum-meruit claim.

### D. Promissory Estoppel

Plaintiff also seeks to recover under a theory of promissory estoppel for the same oral promises that formed the basis of his breach of contract claim. To plead a cause of action for promissory estoppel, a quasi-contract claim under New York law, a plaintiff must allege (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance. *Karmilowicz*, 2011 WL 2936013, at *12. Furthermore, promissory estoppel is a narrow doctrine typically applied only when the plaintiff has suffered an "unconscionable injury" or when otherwise "necessary to avoid injustice." *Kleinberg v. Radian Grp., Inc.*, No. 01-cv-9295 (RMB) (GWG), 2002 WL 31422884, at *10 (S.D.N.Y. Oct. 29, 2002) *report and recommendation adopted*, 240 F. Supp. 2d 260 (S.D.N.Y. 2002) (citing *Cyberchron Corp. v. Calldata Systems Development,* 47 F.3d 39, 44 (2d Cir. 1995)).

Here, Plaintiff's allegations fail as a matter of law to satisfy the second element of promissory estoppel, which requires that any reliance on a promise be reasonable. "Reliance on promises contrary to a written contract with a merger clause is unreasonable as a matter of law." *Integra FX3X Fund, L.P. v. Deutsche Bank, AG*, No. 14-cv-8400 (JPO), 2016 WL 1169514, at *5 (S.D.N.Y. Mar. 22, 2016); *see also D'Accord Fin. Servs., Inc. v. Metsa-Serla Oy*, No. 98-cv-5847, 1999 WL 58916, at *4 (S.D.N.Y. Feb. 8, 1999) (same). Plaintiff's claim also fails for the additional, independent reason that the "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Id.* (quoting *Clark–Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 521 N.Y.S.2d 653, 656 (N.Y. 1987).

Despite this settled law, Plaintiff again attempts to distinguish his claim by asserting that the oral promises at issue here related to the *non-discretionary* portion of his bonus. (Opp'n at 15–16.) This argument is

unpersuasive. Whether discretionary or non-discretionary, the alleged promise related to Plaintiff's bonus compensation, which falls squarely within the subject matter of his wholly integrated, unambiguous employment agreement. That written instrument, which also disallowed oral modifications, bars Plaintiff's quasi-contract claim and renders his reliance on alleged oral promises made before and after execution unreasonable as a matter of law.

E. Connecticut Unpaid Wages Statute

Plaintiff also seeks to recover his allegedly promised bonus for 2014 under Section 31-71a(3) of the Connecticut General Statutes. As an initial matter, that provision neither requires nor proscribes any conduct; it merely defines "wages" for purposes of Sections 31-71a through 37-71i of the statute. Nevertheless, the Court will construe Plaintiff's complaint as alleging a cause of action under Section 31-72, which authorizes employees whose wages have been withheld to bring a civil action for recovery of such wages.

To support his statutory claim for unpaid wages, Plaintiff again relies on the two oral bonus promises alleged in the complaint: one made to entice Plaintiff to come aboard Carlyle by guaranteeing him a minimum 10 percent bonus, and one intended to dupe him into manning the sinking ship two years later by guaranteeing him a "more competitive double-digit rate." Defendants seek to dismiss this claim on the ground that, among other things, Plaintiff's allegedly promised bonuses do not qualify as "wages" under the statute. *See* Conn. Gen. Stat. § 31-71a, *et seq.*

Under that statute, compensation is classified as "wages" if it satisfies three factors: (1) the award of compensation is non-discretionary, (2) the amount of the compensation is non-discretionary, and (3) the amount of the bonus is dependent on the employee's performance. *Roberts v. TriPlanet Partners, LLC,* 950 F. Supp. 2d 418, 425 (D. Conn. 2013). With respect to the second factor, the Connecticut Supreme Court has definitively ruled that even where a plaintiff is contractually entitled to a bonus, the bonus does not constitute "wages" where the *amount* of the promised bonus is indeterminate and discretionary. *Ziotas v. Reardon Law Firm, P.C.*, 997 A.2d 453, 458 (Conn. 2010).

Here, Plaintiff's employment agreement plainly specifies that his bonus was to be "discretionary." That alone is sufficient to defeat Plaintiff's claim for unpaid wages. *See Wood v. Sempra Energy Trading Corp.*, No. 3:03-cv-986 (JCH) 2005 WL 465423, at *12 (D. Conn. Feb. 22, 2005) (rejecting similar unpaid-wages claim based on orally promised non-discretionary bonus where written agreement provided only for discretionary bonus). Moreover, as to the second alleged oral promise, Plaintiff's own factual allegations indicate that the promise was for an indeterminate amount: a "more competitive double-digit rate." Thus, Plaintiff's allegedly promised bonus for 2014 does not constitute "wages" under Connecticut law, and his Connecticut unpaid-wages claim must be dismissed.

F. New York Unpaid Wages Statute

Plaintiff brings a similar claim for unpaid wages under New York Labor Law § 190, *et. seq*. Plaintiff does not explain why New York law even applies, given his alleged Connecticut residency, nor does the complaint clearly indicate what provision of the statute is at issue. Nevertheless, Plaintiff appears to invoke Section 191(1)(c), which covers "commission salespersons." (*See* SAVC ¶¶ 5, 102; Opp'n at 18). The definition of "commission salesperson" includes "any employee whose principal activity is the selling of . . . securities . . .

11

and whose earnings are based in whole or in part on commissions," but excludes employees "whose principal activity is of a supervisory, managerial, executive or administrative nature." N.Y. Lab. Law § 190(6). The statute provides that "[a] commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment." *Id.* § 191(1)(c). Plaintiff seems to argue that Defendants violated that provision by failing to pay his orally promised bonus for 2014.

As an initial matter, Defendants argue that Plaintiff, as a portfolio manager, was an "executive" within the meaning of § 190(6), and is therefore excluded from the protections of § 191(1)(c). An employee qualifies as an "executive" if he "exercises independent judgment" in performing his duties. *Carlson v. Katonah Capital, L.L.C.*, 814 N.Y.S.2d 889 (Sup. Ct. 2006) (quoting *Dean Witter Reynolds, Inc. v. Ross*, 75 A.D.2d 373, 380 (1st Dep't 1980)). Here, neither Plaintiff's employment agreement nor his complaint describe his job responsibilities in sufficient detail for the Court to assess whether his position was "executive . . . in nature." *Accord Zentz v. Int'l Foreign Exch. Concepts, L.P.*, 939 N.Y.S.2d 745 (Sup. Ct. 2011), *aff'd*, 106 A.D.3d 904 (N.Y. App. Div. 2013) (finding issue of fact as to whether portfolio manager qualified as an executive where "very little ha[d] been made known to the court regarding what plaintiff's job responsibilities were.")

Nevertheless, Plaintiff's claim fails because Section 191(1)(c) expressly applies only to "monies earned or payable in accordance with the agreed terms of employment[.]" N.Y. Lab. Law § 191(1)(c); *see Pouncy v. Advanced Focus, LLC, et al.*, No. 15-CV-6260 (JMF), 2017 WL 4280949, at *8 (S.D.N.Y. Sept. 25, 2017). "It is beyond dispute that the phrase 'in accordance with the agreed terms of employment' means that the parties to an employment agreement may define for themselves the circumstances under which wages [or commissions] are 'earned.'" *Giugliano v. FS2 Capital Partners*, LLC, No. 14-cv-7240, 2015 WL 5124796, *15 (E.D.N.Y. Sept. 1, 2015) (citations omitted). Here, as the Court has already explained, the terms of Plaintiff's employment were memorialized in his written employment agreement, which included a no-oral modification clause and specified that Plaintiff's bonus, "if any," was to be "discretionary." Thus, the alleged oral bonus promise was not "in accordance with the agreed terms" of Plaintiff's employment. New York Lab. Law § 191(c); *see Pouncy*, 2017 WL 4280949 at *8 (rejecting commissioned-salesperson claim where defendant complied with written employment agreement). The Court therefore dismisses Plaintiff's New York unpaid-wages claim.

G. Connecticut Whistleblower Statute

In his third cause of action, Plaintiff alleges that he was wrongfully discharged in violation of Connecticut's whistleblower statute, Conn. Gen. Stat. § 31-51m. In relevant part, that provision provides that "[n]o employer shall discharge . . . any employee because [] the employee . . . reports, verbally or in writing, a violation . . . to a public body." Conn. Gen. Stat. Ann § 31-51m(b). The statute further defines "public body" as "any public agency" or "any federal agency." § 31-51m(a)(4).

Here, as Defendants point out, Plaintiff does not allege that he reported any wrongdoing to a "public body" before his termination, so he cannot state a claim for wrongful discharge under Section 31-51(m). Although Plaintiff alleges that he brought his concerns about the Viridian Fund to the

12

attention of his superiors at Carlyle, the complaint indicates that he first notified a public agency on July 24, 2015 – six months after his termination – when he filed a complaint with the Occupational Safety and Health Administration ("OSHA"). (SAVC ¶ 17.) Indeed, Plaintiff does not now contend otherwise; in fact, he concedes that he cannot state a claim under § 31-51(m). (Doc. No. 70 at 30.). Accordingly, this claim too must be dismissed.

## H. Sarbanes–Oxley Act

Finally, Plaintiff brings a claim under 18 U.S.C. § 1514A of the Sarbanes-Oxley Act, alleging that Defendants (except Zuech) violated the Act's whistleblower protection provisions by terminating his employment. Unlike the Connecticut whistleblower statute, Sarbanes-Oxley does not require an employee alleging retaliation to have reported wrongdoing to a public body before his termination. *See* 18 U.S.C. § 1514A(a)(1)(C). The Act does, however, require the employee to exhaust certain administrative remedies before suing in federal court. 18 U.S.C. § 1514A(b); *Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 419 (S.D.N.Y. 2012). Specifically, the employee "must file a complaint with [OSHA] and afford OSHA the opportunity to resolve the allegations administratively." *Willis v. Vie Fin. Grp., Inc.*, No. CIV.A. 04-435, 2004 WL 1774575, at *3 (E.D. Pa. Aug. 6, 2004) (citing 18 U.S.C. § 1514A(b)(1)(A)). If "a final administrative decision has not issued within 180 days of the filing, the employee can proceed with an action in federal court based on that violation." *Id.*; *accord Wong*, 890 F. Supp. 2d at 417.

Here, Plaintiff alleges that he properly exhausted administrative remedies with respect to his claims against the Carlyle Group. (SAVC ¶ 17.) Specifically, Plaintiff alleges that he filed a timely claim with OSHA, that the matter was investigated, and that 180 days expired without any findings, thereby entitling him to bring his action in federal court. (*Id.*)

Defendants contend, however, that Plaintiff failed to satisfy the exhaustion requirement with respect to the Carlyle Group because "The Carlyle Group" was never named as a defendant in the caption of Plaintiff's administrative complaint. The only Carlyle entity included in the caption was the "Carlyle Group Employee Co." (Doc. No. 67-3 at 2.)

Plaintiff filed his administrative complaint with OSHA on July 24, 2015. (SAVC ¶ 17.) The Court may consider that document here, at the motion-to-dismiss stage, because it is incorporated by reference in Plaintiff's pleadings. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). In the OSHA complaint, Plaintiff named "Carlyle Group Employee Co." in the caption, and then identified the Carlyle Group and Carlyle Group Employee Co. "collectively" as his former employer in the first paragraph of the complaint. (Doc. No. 67-3 at 2.)

The Court is unpersuaded by Defendants' hypertechnical argument regarding the exhaustion requirement. The primary purpose of the Sarbanes-Oxley exhaustion requirement is to provide OSHA "an opportunity to issue a final decision with respect to the plaintiffs' claims against [that entity]." *Bridges v. McDonald's Corp.*, 2009 WL 5126962, at *3 (N.D. Ill. Dec. 21, 2009). Moreover, "there are no pleading requirements for whistleblower actions" under Sarbanes-Oxley. *Wadler v. Bio-Rad Laboratories, Inc.*, 141 F. Supp. 3d 10005, 1012 (N.D. Cal. 2015); 29 C.F.R. § 1980.103(b) ("No particular form of complaint is required.") Complaints in OSHA proceedings are "not expected to meet the standards of pleading that apply to

13

claims filed in federal court under Rule 12(b)(6)," so long as the whistleblower gives the opposing party "fair notice" of the charges against it. *In The Matter Of: Douglas Evans v. U.S. Envtl. Prot. Agency*, 2012 WL 3164358 (DOL Adm. Rev. Bd., July 31, 2012), at *6.

Here, though Plaintiff failed to name "The Carlyle Group" in the caption of his administrative complaint, his reference to "the Carlyle Group" and Carlyle Group Employee Co. "collectively" as his former employer in the first paragraph of his complaint afforded Defendants and OSHA adequate notice. *See Morrison v. MacDermid, Inc.*, 2008 WL 4293655, at *3 (D. Colo. 2008) ("As no specific form of complaint is required . . . [Plaintiff's] letter afforded OSHA the opportunity to perform an adequate investigation as to [Defendant's] role in his termination.").

Thus, the Court denies Defendants' motion to dismiss the Sarbanes-Oxley claim with respect to "The Carlyle Group."

### IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' motion to dismiss is granted in part and denied in part. Specifically, Defendants' motion to dismiss is granted with respect to Plaintiff's third, fourth, fifth, sixth, seventh, eighth, and ninth causes of action. Defendants' motion to dismiss is denied with respect to Plaintiff's first cause of action. The Clerk is respectfully directed to terminate the motion pending at docket number 65.

IT IS HEREBY ORDERED THAT, if Plaintiff still wishes to file his third amended complaint, he shall file a motion seeking leave to amend by October 12, 2017. Per Rule 2A of the Court's Individual Rules and Practices, he shall attach (1) the proposed amended pleading, and (2) a blackline comparison of the operative pleading and proposed amended pleading. Defendants shall submit their response, if any, by October 26, 2017.

Moreover, in light of the fact that discovery will be proceeding for Plaintiff's Sarbanes-Oxley and Dodd-Frank claims, IT IS FURTHER ORDERED THAT, by October 9, the parties in this action shall submit to the Court a revised proposed case management plan and scheduling order. A template for the order is available at: http://www.nysd.uscourts.gov/judge/Sullivan. The parties shall file the proposed case management plan and shall email a courtesy copy to chambers at: sullivanNYSDchambers@nysd.uscourts.gov

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 29, 2017
New York, New York

\* \* \*

Plaintiff Nikhil Dhir is represented by Kristan Peters of PetersHamlin LLC, 37 North Ave. Suite 201, Norwalk, CT 06581.

Defendants are represented by Lawrence P. Postol of Seyfarth Shaw, 975 F. Street, N.W., Washington, DC 20004 and Robert A. Van Kirk, Vidya Atre Mirmira, and Joelle Justus of Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, DC 20005.

14